Good morning, Your Honors. I'm Suzelle Smith representing the appellants, the Levins. Your Honors, this is an important case as the district court recognized in entering the 54B judgment. It's important because district courts are struggling with trying to apply Haussler and Calderon to these EFTs and assets. It's an interesting case because we're a most of the cases come up on a summary judgment or a turnover motion posture. But we're at the pleading stage and J.P. Morgan convinced the district judge that this court's ruling in Calderon and Haussler, those rulings had created a bright line that set some sort of rule that if a correspondent bank was the transmitting bank into New York, then that assets were not property of Iran. So I think we look first and we look at TRIA and 1610G and we say clearly, and J.P. Morgan and the district court agree, I believe, that assets of, blocked assets of Iran or its agencies or instrumentalities would be subject to execution and collection. No question about that. That is what we plead. We plead that these are assets of Iran. We have a, we are pleading that we're asking the court to take. Our pleading says that the bank, Lloyds Bank of London, which did the transfer, it is not an intermediary bank, which was the language that this court used in Haussler and Calderon, also the language of the UCC. We say it's not an intermediary bank. You say it's a correspondent bank. We say it's a correspondent bank, but not just that, Your Honor. I think the problem here is that this is a right of property case, which is fact rich, which the Second Circuit recognized in Haussler and Calderon, that there were cases where it wasn't stipulated what the relationships were between the various entities. So it's a, it's a property law case in Haussler and Calderon. The Second Circuit said that in the case of North Korea and in the case of Cuba, the regulations that create the basis for the blocking do not include EFTs. The Iranian regulations are different. They include any financial instrument, which we would argue includes, it's intended to be broad in the case of Iran. Iran is a different relationship to the United States than Cuba or North Korea, and we would argue federal law, those blocking regulations, would answer the question that these blocked assets, and Your Honors, they are blocked assets. They're called Iranian blocked assets because the originator was the National Bank of Iran, Bank Sadrat, which has been held, and J.P. on the list. So the whole question here is, is the property that's in the hands of Lloyds Bank of London at the time that it comes into the United States property of Lloyds Bank of London, or is it property of Bank Sadrat? We say, we plead, and by the way, we didn't just make this up. We went, we researched, we look at what Lloyds publishes, their relationship is with correspondent banks. They plead, their agents, I'm sorry, plead, they publish that they're agents, they publish that they do general activities for the correspondent banks, and most importantly, that the money that they take and put into these accounts, different from this fleeting, you know, very quick run through of the normal EFT where you've just got a bunch of banks in line. They're not banks that have established relationship with the other bank. We say, correspondent bank, the money remains the property of Bank Sadrat. The UCC says you can vary your relationships, your commercial relationships can be varied by contract, oral, cut. That particular decision, that argument made more difficult by our decision in Doe, that they buried the contractual relationships in such a meaningful way as to take it out of our holding in Haussler. You mean the district court holding. So the district court, without analyzing correspondent banks at all, makes a statement, correspondent banks are the same thing as intermediary banks. We say, there's nothing in the UCC that says that, there's no opinion of this court that is the relationship of the correspondent bank to its principle that it is acting on behalf of. That is fact rich, as you said in Haussler and Calderon. When there are disputes like that, the district court needs to grant the amendment and then let us do the discovery and build the factual record to present to the district court and to this court as to whether or not the property is property of Bank Sadrat when it comes into the United States. If it is, Your Honor, then TRIA and 1610G say those assets are collectible. So I think that distinguishes it and I don't think there's any ruling of this court that there's some law that says what a correspondent bank is. It can vary by the arrangements of the parties. Your Honor, I think maybe what you were asking was, can the parties somehow make a difference in the ownership? The answer to that is, the parties can make a difference in the ownership if that is part of their contractual agreement and that's what the UCC allows them to do. Can I ask you a question? Before you go? Yes, sir. As I read, and I read it a number of times to try and understand, it seemed to me that you use agent and agency as sort of meaning the same thing. Can a bank do a service for me, for example, as my agent sending money somewhere without being my instrumentality or my agency or do the two things mean the same? Your Honor, I think they're very close. I again think that's a fact-rich question. So if we had been allowed to amend, we would have then presented the evidence as to exactly the facts about Lloyds Bank and Bank Soderot and whether or not they meet the definition of agent and agency. There was no case I could find that made a distinction between those two in the terrorist litigation that made a distinction and said, oh well, you're an agent but you're not an agent. That would be a question, Your Honor, that I think would be explored down below but it definitely was not the basis for the ruling by the District Court. Thank you, Your Honor. Good morning, Your Honor. Stephen Feigenbaum, Katsky-Corins, LLP, Counsel for Appellee, J.P. Morgan Chase Bank. At the outset, I want to reiterate J.P. Morgan's sympathy for the Levins and other victims of terrorism. J.P. Morgan has absolutely no interest in impeding their collection efforts. J.P. Morgan has turned over substantial sums of money to the Levins and other judgment creditors in the past. But the bank cannot, the bank must follow the law and the bank cannot knowingly turn over a blocked asset that is not subject to execution under governing law. And that is precisely the case here. The question presented is whether or not this blocked account, what we call the SATARAT blocked account, is subject to execution in light of Haussler and Calderon and the answer is clearly no. The Haussler and Calderon stand very clearly for the proposition that the only entity in the wire transfer chain that has a property interest in a blocked account is the entity that preceded the blocking bank in the chain. In this case, that entity that preceded J.P. Morgan, which blocked the account, was Lloyd's Bank. Lloyd's Bank is undisputedly not an instrumentality of Iran and therefore under Haussler and Calderon that is the end of the inquiry. Have you, neither one, I haven't seen a 28-J letter from either of you on our decision on Doe recently. I'm sorry? I haven't seen it. Did you submit a 28-J letter on our decision Doe, Judge Parker? Actually, I argued Doe for J.P. Morgan. Doe did file a petition for rehearing in Bonk, yes. I know that, but in this case, did you draw the attention to the panel of Doe? We did not in our brief because Doe had not been decided yet. So then I'll ask again, why wasn't there a 28-J letter on Doe? Don't you think Doe is relevant to our consideration of this case? Well, the district court decision— Because in Doe, the intermediary banks attempted to say, we don't want anything to do with these funds. We'll throw our hands up and we don't want anything to do with them. And Doe then tried to argue that in that instance that what we're really dealing with was the funds of the terrorist entity and therefore they should be subject to seizure. And the court rejected that argument, didn't it? Correct. And the issue in Doe is a little different from the issue here. I understand that, but— And so if the court has ruled that a correspondent or intermediary bank's disclaimer of an interest in blocked funds, when it would otherwise, under Haussler or Calderon, be the entity with the property interest in those blocked funds, the disclaimer by itself does not cause the property interest to revert back upstream to the originator. Here you don't even have a disclaimer by bank or Lloyd's Bank. So a fortiori, I believe this case is easier to decide than in Doe. There is, in terms of the question of whether there's a distinction between a correspondent bank and an intermediary bank, which is Appellant's principal argument, the answer is no. Those words are basically used interchangeably. A correspondent bank becomes an intermediary bank once it commences the electronic funds transfer, doesn't it? Correct. I mean, that's the very nature of why you have a correspondent bank, because they have a relationship in New York. That's correct. A correspondent bank is brought into the picture in order to create a relationship that otherwise doesn't exist so that the series of credits and debits can continue on down the chain. What do you say to their argument that they should have been allowed to amend to show that the agency relationship and that, therefore, this was truly the money of the Iranian bank? All correspondent banks, as far as I know, are agents of the— That's the nature of why there are correspondent banks, isn't it? Absolutely. Whether or not there's an agency relationship, which, by the way, is separate from the agency or instrumentality standard under TRIA, but whether it's an agent or not is irrelevant under Haussler or Calderon. Haussler and Calderon simply look to see what is the entity or who is the entity that preceded the blocking bank in the wire transfer chain, and if that entity is not an instrumentality of the judgment debtor, he or I, Iran, then the account, the blocked account, is not subject to execution under TRIA or under FSIA 1610G. Mr. Feigin, I agree with you. This is not a pleasant task for anyone. There are times when the oath pinches. The resolution of this, is that, in your view, is the resolution of this by executive order or act of Congress broadening the authority with regard to the ability to seize assets of terrorist entities? Probably, yes. To look beyond what seems like an artificial distinction of an intermediary bank and an agency relationship to allow the funds to be seized because they truly are the assets of a terrorist entity? Unless this Court were to reverse itself or change the standard that was established in Haussler and Calderon, then yes, I think congressional action would be the way to change the standard. I had a little trouble understanding the facts in this respect. It relates to Judge Wesley's questions, I think, a moment ago. If execution were permitted, who is out the money and why? Who is out the money? Which bank is out the money? I couldn't quite tell when this game of musical chairs stopped and the federal office issued its blocking order, where the credits and the debits were located. Ultimately, the party that is out the money is the beneficiary of the wire transfer. You have an intended transfer of funds from the originator ultimately to the beneficiary. When those funds are blocked, then ultimately the entity that loses or does not get the money it was supposed to get is the beneficiary. So, Lloyds and J.P. Morgan have no company interest in this process? They're going to be whole no matter what? They do not have property interests in the funds, no. They are simply intermediary banks that facilitate the transaction. It's obviously, they're in the business to make money. There are fees associated with correspondent banking, but they do not have a property interest in the funds themselves, whether blocked or unblocked. But except as to, in a situation like this, where funds are blocked, then the property interest is with the entity that preceded the blocking party in the wire transfer chain, and that was Lloyds Bank. Will Lloyds Bank be out the $3 million or no? Under these circumstances, no, they're not. Again, it would only be the party that was intended to receive the $3 million, the beneficiary. Thank you. Thank you, Your Honors. I think it's clear, but just so it's underlined. This is about money laundering and violation of U.S. law and the blocking of assets which has already happened by OFAC. J.P. Morgan carries it out. Haussler and Calderon created an exception. Whether I understand it or not, or at least it's policy, it says, as I read it, that if it's an EFT where the property ownership is not in the terrorist entity, then that asset cannot be executed. Well, it looked to New York law to figure out who owned it. So I think you're misstating the context in which the analysis occurs. The question is who owns it, so therefore, whose is it to be seized? Yes, Your Honor. And because there was no definition of who owned it in federal law, we had to look to state law. And state law, New York law, tells us that it's the property of the intermediary bank. Well, looking at the U.S. It wasn't a policy choice made by judges. It was a simple calculation. Judges didn't necessarily enjoy doing that. They had something to do. So tell me how this is different, not because it's a correspondent bank or because there's an agency relationship, because those things already existed in prior circumstances. Tell me in federal law how this is different. Tell me where there's a regulation language that broadens the scope of the ability to seize. So two things. So when you look at the Iranian regulations, which are different than either the Cuba or the North Korean financial instruments, EFTs are financial instruments. So the Iranian regulations sweep in more. They're different than the Cuba and the North Korean. And Your Honor, on the UCC question, though, the question of a variation by contract under the UCC was simply not decided by the Second District. They agreed that these were intermediary banks that came under the off-the-rack rule of the UCC. It wasn't argued that those banks had made a specific agreement, like Lloyd's did, that the money remained the property of the terrorist entity. And you say that's why you should have been allowed to amend? Yes, sir. All right. Yes. Any other questions? Thank you, Your Honor. Thank you both for your arguments. Well argued.